| | |
|---|---|
| CRAIG A. BROWN, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) 2:10-cv-00523-GZS |
| | ) |
| MICHAEL FERRARA, et al., | ) |
| | ) |
| Defendants | ) |

### RECOMMENDED DECISION RE:

**RONSON'S MOTION TO DISMISS (DOC. NO. 31); GALE'S MOTION TO DISMISS (DOC. NO. 32); ROCKPORT DEFENDANTS' MOTION TO DISMISS (DOC. NO. 36); and RICHARDS & CRANSTON'S MOTION TO DISMISS (DOC. NO. 40)**

Plaintiff Craig Brown and his neighbor, Defendant Michael Ferrara, have been involved in a longstanding boundary dispute. The dispute involved Ferrara's erection of a fence and Brown's removal of the fence, resulting in both criminal and civil litigation in the state courts. Having met with little success in the courts of the State of Maine, Brown has now moved the litigation to federal court where he is suing, among others, a conglomeration of Ferrara, attorneys, surveyors, and municipal officers and police personnel in two municipalities for allegedly conspiring to deprive him of his civil rights and for a variety of common law torts. Brown has also asserted a RICO claim against these defendants. Many of the twenty-one defendants have filed dispositive motions. This recommended decision groups four motions to dismiss, but not because the movants are necessarily related. I have addressed Ronson, Gale, the Rockport Defendants, and Richards & Cranston in the same recommended decision because I recommend that all federal claims against them be dismissed for failure to state a claim. With respect to the four Rockport defendants, I recommend the dismissal with prejudice of state law

claims as well.

## MOTION TO DISMISS STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that a complaint can be dismissed for "failure to state a claim upon which relief can be granted."  In deciding a motion to dismiss, the court accepts as true the factual allegations of the complaint, draws all reasonable inferences in favor of the plaintiff that are supported by the factual allegations, and determines whether the complaint, so read, sets forth a plausible basis for recovery.  Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 320 (1st Cir. 2008).  To properly allege a claim in federal court, it is not enough merely to allege that a defendant acted unlawfully; a plaintiff must affirmatively plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).

Because Brown is a *pro se* litigant, his complaint is subjected to "less stringent standards than formal pleadings drafted by lawyers," Haines v. Kerner, 404 U.S. 519, 520 (1972), and his pleadings may be interpreted in light of supplemental submissions, such as his responses to the motions to dismiss, Gray v. Poole, 275 F.3d 1113, 1115 (D.C. Cir. 2002);  Wall v. Dion, 257 F. Supp. 2d 316, 318 (D. Me. 2003).  In this case, Brown has filed responses to all four motions to dismiss (Doc. Nos. 49-50, 54, 61), but his responsive memoranda do not contain any new factual allegations or supplemental submissions that would shed further light on his claims.

## FACTUAL ALLEGATIONS PERTAINING TO THE MOVANT DEFENDANTS

The motions to dismiss addressed herein concern the allegations pertaining to Gusta Ronson, a surveyor who performed work for Brown, Attorney Jon Gale, who represented Brown on a criminal mischief charge, Richards & Cranston, a surveying firm that performed work for

Defendant Ferrara, the Town of Rockport (which is not the town where the property dispute is situated), and Robert Peabody, Mark Kelley, and Wesley Butler, who served the Town of Rockport as, respectively, town manager, police chief, and patrol officer.

### Gusta Ronson

Gusta Ronson is a surveyor situated in the Town of Belfast. (Compl. ¶ 21.) In 2003, Michael Ferrara's attorney notified Brown that Ferrara would be erecting a fence along a common boundary. (Id. ¶ 107.) When the fence went up, it was closer to Brown than a row of ties Brown had previously laid out along the boundary. (Id. ¶ 108.) After the fence went up, Ronson did a simple "pin check" for Brown and Brown's attorney, Eric Morse, and Ronson reported that the fence erected by Ferrara was 25 feet from the corner of Ferrara's house. Brown suspected that Ferrara's surveyors had relocated the pins originally set by the developers because a 2001 engineering report made by Jeff Nims, the zoning officer for the Town of Camden, described the Ferrara residence as being inside of the 25-foot setback requirement. Brown believed that Ferrara was trying to take adverse possession of a portion of Brown's lot. (Id. ¶¶ 109-110.) Although he placed weight on Ronson's report, Brown has also alleged that he thinks Ronson's survey was flawed because of its description of the rear boundary of his lot. (Id. ¶ 111.)

Ronson does not appear in the complaint again for another 25 pages. Eventually, Brown alleges that Attorney Morse and Ronson conspired to commit fraud, professional misconduct, and conspiracy against rights because Morse recommended that Ronson do a "simple survey" after Ferrara had put up the fence. According to Brown, Morse should have recommended that Brown insist on a "certified boundary survey" prior to the erection of the fence. Had Morse done so, Brown would have had legal recourse against the surveyor if the survey was flawed. Brown

contends that Ronson lied and misrepresented the survey results by telling Brown that the fence was erected on Ferrara's lot rather than on Brown's. (Id. ¶ 211.) Brown says he did not discover this "fraud" until early 2009 and that his ignorance of it somehow prevented him from appealing criminal charges arising from his removal of a portion of the fence. (Id. ¶ 212.) Brown characterizes this conduct by Morse and Ronson as "premeditated acts of retaliation against a victim of a crime," which is a federal crime pursuant to 18 U.S.C. § 1513. (Id. ¶ 213.)

According to the allegations, Ronson and others committed perjury at Brown's later trial for criminal mischief[1] in order to deprive Brown of his property rights ("extort," says Brown), all in violation of federal criminal statutes and state statutory obligations imposed on surveyors. (Id. ¶¶ 277, 278.) Presumably, Ronson's alleged "perjury" related to Ronson's survey work that placed the fence on Ferrara's property. Brown also alleges that Nims and others "directed" the Maine Professional Board of Land Surveyors to dismiss Brown's professional negligence complaints against Ronson and other surveyors. (Id. ¶ 289(a).) Ronson is mentioned by name in various other wherefore clauses and conclusory paragraphs stating an entitlement to relief, but no further factual allegations are made about his conduct or his relationship to the other defendants. (Id. ¶¶ 281, 294, 299.)

### Jon Gale

Jon Gale is a criminal defense lawyer in Portland, Maine who represented Brown in 2009 and/or 2010 in connection with the felony charge of criminal mischief. (Id. ¶ 16.) Brown was in Georgia when he learned that the Camden police had a warrant for his arrest and he contacted Gale from Georgia and made arrangements for representation. (Id. ¶ 260.) Upon Brown's return, Brown and Gale met and Gale informed him of a plea "deal" offered by the Knox County

---

[1]    See Brown v. Town of Camden, No. 2:10-cv-00063 (Doc. 14-1) (containing a judgment and commitment dated March 4, 2010).

District Attorney. Gale informed Brown that, if Brown allowed Ferrara to put the fence back, the District Attorney would defer prosecution for one year. Gale did not tell Brown that if he agreed to this deal he would give up his property rights under the doctrine of collateral estoppel. (Id. ¶ 261.) Gale proposed that Brown pay him $5,000.00 in exchange for negotiating this deal that would lead to the ultimate dismissal of the charges after one year. (Id. ¶ 262.) According to Brown, Gale acted in concert with Geoff Rushlau and Lindsay Jones, state prosecutors, Michael Ferrara, and Joseph Baiungo, Ferrara's attorney, to use the threat of criminal prosecution to extort and defraud Brown for the benefit of Ferrara and others. (Id.) Only hours before a court hearing on an order for protection at the Rockland District Court, Brown fired Gale because he had learned from other attorneys at a different law firm that Gale's advice "would have given away [Brown's] property rights." (Id. ¶ 263.) Brown characterizes these happenings as "a conspiracy against rights, fraud against the court, obstruction of justice, professional misconduct by lawyers, and retaliation against a victim/witness." (Id. ¶ 264.) Gale is further mentioned in occasional wherefore clauses and paragraphs containing conclusory statements about Brown's entitlement to relief. (Id. ¶¶ 282, 298, 300, 310.)

***The Rockport Defendants***

There are three individual defendants who are included in this action because of their employment by the Town of Rockport: Town Manager Robert Peabody, Police Chief Mark Kelley, and Patrol Officer Wesley Butler. Brown also asserts a claim against the Town of Rockport. I recount the allegations against these defendants, starting with Officer Butler and working up the chain of command.

*Wesley Butler*

Wesley Butler is a Rockport patrol officer who gave Brown a ticket for an expired

inspection sticker in July of 2008, when Brown was peacefully entering a Rockport market to buy a loaf of bread. (Id. ¶ 20.) The allegations are that Brown had parked his car and was about to enter the market when Butler arrived in a police cruiser "with lights blazing." Butler ordered Brown to "shut up and get into his car." On the day in question, Brown was driving his wife's car and it had an expired inspection sticker. However, Brown had not seen Butler during his drive to the market and the inspection sticker was on the front windshield of the car, and therefore Butler could not have seen it. Butler, allegedly "best described as a 'little pipsqueak,'" badgered Brown during this traffic stop and invaded his personal space. (Id. ¶¶ 152, 229.[2]) Brown implicates Butler in Count 29, alleging false imprisonment because he was ticketed. (Id. at 51.) According to Brown, Butler should be imprisoned for at least one year (or maybe six) as a result of his conduct. The Court should also order that Butler be fired, says Brown. (Wherefore Clause at 55.) Other mentions of Butler lack new factual allegations, but recite conclusory language demanding certain relief. (Id. ¶¶ 298, 310.)

*Mark Kelley and Robert Peabody*

Mark Kelley is the Town of Rockport's chief of police. (Id. ¶ 9.) He is responsible for the promulgation and implementation of policies and procedures for the Rockport Police Department. (Id. ¶ 13.) He is implicated, in conclusory fashion, with other defendants (Butler and Peabody) who allegedly inflicted harm on Brown. (Id. ¶¶ 298, 300, 310.) Robert Peabody is the town manager of Rockport. (Id. ¶ 9.) He is described as the final policy maker who has supervisor authority over Mark Kelley and the Rockport Police Department. (Id.) According to Brown, Peabody and Kelley failed to instruct, supervise, control, and discipline Rockport police officers in regard to their interactions with Brown to ensure that they did not deprive Brown of

---

[2]     Size is relative and Brown notes that Butler is a "'little pipsqueak' relative to Plaintiff's size and strength." (Compl. ¶ 229.)

his rights.  (Id. ¶ 220.)  Peabody and Kelley also had the power to prevent or aid in preventing the wrongs done to Brown, had they exercised due diligence.  (Id. ¶ 222.)  The allegation is that Peabody and Kelly approved the conduct of the Rockport police department, which involved harassing Brown and his wife Pamela Belanger by following them in vehicles whenever they drive around Rockport.  This harassment started in 2008 and continued through 2010.  (Id. ¶¶ 224, 225.)  Peabody and Kelley are named in other paragraphs and wherefore clauses alleging various harms, but there are no further factual allegations.  (Id. ¶¶ 232, 298, 300, 310.)

*The Town of Rockport*

The Town of Rockport is allegedly implicated in racketeering activity because of open harassment by Rockport police.  This has allegedly included the use of excessive force in the arrest of Brown on a traffic violation, though the complaint does not describe the use of force.  (Id. ¶ 57.)  Rockport began its open harassment of Brown in 2008 by following him closely in police cars.  (Id. ¶ 151.)[3]  Rockport is named in Brown's RICO claim due to this alleged pattern of harassment.  (Count 28 at 51.)  Robert Peabody, Mark Kelley, Wesley Butler and the rest of the Rockport Police Department allegedly acted at all times pursuant to the direction and control of the Town of Rockport and the Town of Rockport failed to properly instruct, supervise, control and discipline Rockport police officers to protect Brown's rights.  (Id. ¶¶ 218, 220.)

Brown "believes" that the Town of Rockport has tracked his movements when he travels by car, theorizing that Michael Ferrara placed a GPS tracking device on Brown's vehicles.  (Id. ¶ 228.)  Among other relief sought against the Town of Rockport, Brown wants the Court to order that its police budget be turned over to Knox County because "it is clear that the [Rockport]

---

[3]        Brown relates that he tried to obtain an order for protection from the Rockland District Court, but that Judge Westcott refused to hear the complaint, declared the allegations frivolous, and sanctioned Brown to obtain court permission before filing any more claims.  (Compl. ¶ 153.)

police are acting as thugs and hoodlums for local bullies like the Laites."[4]  (Id. at 55.)

***Richards & Cranston Surveyors***

Richards & Cranston[5] is described as a Rockland, Maine surveying firm consisting of Richard Cranston and Donald Richards.  In 1987, Richards & Cranston did the surveying work for the subdivision where Ferrara and Brown own property.  (Id. ¶¶ 77, 85.)  Richards is the coauthor of a Maine Bar Association practice series that details the meaning of deed description wording.  (Id. ¶ 86.)  In 2002 (prior to the fence incident), Brown noticed that surveying activity had transpired on his property, including movement of surveying pins.  (Id. ¶ 100.)  He alleges that Richards & Cranston did the surveying because the new survey pins bore the firm's identifying marks.  (Id. ¶ 102.)  Brown confronted Ferrara about the surveying activity and Ferrara reported an assault.  The Camden police credited Ferrara's report and charged disorderly conduct and felony assault.  (Id. ¶ 104.)

Brown's theory is that the subdivision developers (the Laites), had Richards & Cranston illegally shift the lot lines in order to bring the Ferrara residence into compliance with certain deed setback covenants sometime between 2001 and 2002.  (Id. ¶ 146.)  Brown believes that, because Richards & Cranston is a prominent surveying company in Maine and illegally moved the pins on his property, no other surveyor in Maine will help him to identify and testify about the alleged fraud.  He says he tried to get a surveyor in the four years prior to removing the fence.  (Id. ¶ 138.)  Although Brown complained against Richards & Cranston to the Maine State Board of Professional Licensing, the Board has taken no action to discipline them.  (Id. ¶¶ 148, 168.)  The conspiracy allegations involving shifting lot lines appears to be limited to Richards & Cranston, Michael Ferrara, Parker Laite Senior, Parker Laite Junior, and Coffin Engineering,

---

[4]  The Laites are featured in a companion recommended decision related to the motion to dismiss filed by a collection of Camden-based defendants.
[5]  According to the defendants, the entity is properly identified as Richards, Cranston, & Chapman, Inc.

though future legal proceedings that evolved from these events allegedly involved behind-the-scenes influence from these defendants that has contributed to a deprivation of Brown's property rights and infliction of emotional distress upon him by means of police harassment, false arrest, and other actions.  (Id. ¶¶ 179, 298, 310.)

DISCUSSION

There are three federal claims over which this federal court has original jurisdiction:

(1) a claim of conspiracy to deprive Brown of rights protected by the United States Constitution and federal law, through state action, which arises under 42 U.S.C. § 1983;

(2) a claim of conspiracy to deprive Brown of equal protection or privileges and immunities under the law, through private and/or state action, which arises under 42 U.S.C. § 1985(3);  and

(3) a claim of racketeer-influenced or corrupt acts involving the commission of certain federal crimes pursuant to a criminal enterprise, which arises under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961 et seq.[6]

For reasons that follow, Brown's allegations fail to state a plausible entitlement to relief under any of these federal statutes.  Because this is so, and because the parties are not diverse in their state citizenship, the Court should refrain from exercising supplemental jurisdiction over the pendent state law claims, with the exception of the state law claims against the Rockport defendants which should be dismissed with prejudice for failure to state a claim.

**A.      The Civil Rights Conspiracy**

Brown's federal constitutional claims fall under sections 1983 and 1985 of the Civil Rights Act.  Section 1983 of the Civil Rights Act confers upon every United States citizen a right to redress against any person who, acting under color of state law, causes a deprivation of "rights, privileges, or immunities secured by the Constitution and laws" of the United States.  42

---

[6]      Brown also alleges various federal crimes, but he has no standing to prosecute such claims.

U.S.C. § 1983. For a defendant to be liable under Section 1983 there does not need to be proof of a conspiracy, but claims under this statute sometimes do involve allegations of conspiracy in order to connect private individuals to state action carried out by public servants. Section 1985, on the other hand, expressly prohibits conspiracies to deprive others of equal protection or equal privileges and immunities under the law, and it does not matter whether the defendant is a private person or a state actor. 42 U.S.C. § 1985(3). Gusta Ronson, Jon Gale, and Richards & Cranston Surveyors are not state actors,[7] so the civil rights claims against them truly depend on plausible allegations of a conspiracy to deprive Brown of his federal civil rights.

### 1. *Section 1985 conspiracy*

Brown's Section 1985 claim is the most readily dispatched because he fails utterly to allege a plausible claim of class-based discrimination. With respect to a claim under 42 U.S.C. § 1985(3), the First Circuit Court of Appeals has explained that the plaintiff must be able to demonstrate some "invidious" class-based animus. Romero-Barcelo v. Hernandez-Agosto, 75 F.3d 23, 34 (1st Cir. 1996) (citing Griffin v. Breckenridge, 403 U.S. 88, 102 (1971); Harrison v. Brooks, 519 F.2d 1358, 1359-60 (1st Cir. 1975)).

Brown attempts to delineate such class-based discrimination, associating himself with a class of "persons who own property in Maine, but are originally from other locales." (Compl. ¶ 52.) However, the complaint lacks nonconclusory factual allegations that would support a plausible inference that these defendants conspired to harm Brown because of his membership in

---

[7]     Defendants Ronson, Gale and Richards & Cranston, as land surveyors and counsel in Brown's boundary dispute or as respondents in professional disciplinary proceedings, are not even in the league of a public defender when it comes to assessing state actor liability, and "a public defender does not act under color of state law when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding." Polk County v. Dodson, 454 U.S. 312, 325 (1981). See also Mayercheck v. Judges of Pa. Supreme Court, No. 09-3575, 395 Fed. Appx. 839, 2010 WL 3258257, 2010 U.S. App. Lexis 17790 (3d Cir. Aug. 18, 2010) (per curiam) (unpublished) (affirming dismissal of conspiracy claim that ex-wife, her counsel, and the state court and various judges and court officers conspired to deprive the plaintiff of his constitutional rights).

this particular class of people. Brown's Section 1985 claim fails because he makes no factual allegations to show class-based discriminatory animus directed toward interfering with protected civil rights. Maymi v. P.R. Ports Auth., 515 F.3d 20, 30 (1st Cir. 2008). Nor has Brown made any plausible nonconclusory allegations that these defendants, including the Rockport Defendants, were engaged in a broader conspiracy with other state actors. All of these Defendants, including the Rockport defendants, are entitled to dismissal, with prejudice, of the Section 1985 conspiracy claim.

### 2. *Section 1983*

Section 1983 enables a person to pursue a civil action to vindicate federal constitutional and federal statutory rights when he or she has suffered a deprivation of those rights at the hands of a state actor. 42 U.S.C. § 1983. However, other than providing a cause of action, the statute does not confer any substantive rights; the rights that are vindicated in the action have to arise under another federal statute or constitutional provision. Before considering Brown's conspiracy theory, I discuss the underlying claim that the Rockport state actors subjected Brown to a deprivation that could support a Section 1983 claim. This approach goes to the heart of the matter, without spilling too much ink about the pleading standard that applies to conspiracy claims against non-state actors.

Brown obviously need not plead a conspiracy in order to state a Section 1983 claim against the Rockport Defendants. If there is a plausible allegation that the Town of Rockport, or any of its police officers or town officials, violated Brown's federal rights, then those individuals or the Town could be subject to liability. I begin with the allegations involving Wesley Butler, the only alleged harassment by the Rockport Defendants that contains any meaningful factual information.

*a. Butler's expired inspection (the citation incident)*

Brown's claim against Butler is premised on Fourth Amendment guarantees against unreasonable searches and seizures,[8] as applied to the states through the Fourteenth Amendment. Butler is susceptible to a Section 1983/Fourth Amendment claim because he was a state actor when he issued Brown a traffic ticket for driving with an expired inspection sticker. However, the factual allegations in the complaint do not rise to the level of a constitutional violation.

Although Brown suspects that Butler received information about his movements because of a secret GPS device planted on his car by Ferrara, the fact is that whatever motivated Butler to make the traffic stop, objectively there was clearly probable cause to write a ticket for the citation by Brown's own admission in the body of the complaint. An officer's subjective intent or motivation is not part of the constitutional touchstone of "objective reasonableness" in analyzing Fourth Amendment claims of this kind. Raiche v. Pietroski, 623 F.3d 30, 36 (1st Cir. 2010). Once Butler had determined to make the traffic stop, his constitutional obligation was to use the least amount of force necessary to effectuate the issuance of his traffic ticket. Id. at 37. Brown's complaint is not that the "little pipsqueak" used excessive physical force, but that Butler was rude and badgered him. I know of no case which holds that a police officer's rude demeanor at a traffic stop, without more, subjects him to constitutional liability under the Fourth Amendment, and Brown has cited no such case. There are no other nonconclusory allegations involving Butler in the complaint and he is entitled to dismissal of this Fourth Amendment claim with

---

[8]    Brown frames this complaint as one for excessive force (Compl. ¶ 57), but excessive force in the context of a traffic stop would be treated as a Fourth Amendment violation for purposes of federal  law.  Graham v. Connor, 490 U.S. 386, 395 (1989)( "[*A*]*ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach.").

prejudice. By extension, Kelley and Peabody cannot have supervisory liability for conduct that did not violate Brown's Fourth Amendment rights.

> b. *A pattern of harassment*

The remaining Rockport Defendants might, in theory, have supervisory responsibility for the conduct of unnamed police officers who allegedly harassed Brown. Ordinarily, supervisory liability arises when the supervisor was a direct participant in the rights-violating incident or supervised, trained or hired a subordinate with deliberate indifference toward the possibility that a constitutional violation would occur. Sanchez v. Pereir-Castillo, 590 F.3d 31, 49 (1st Cir. 2009).[9]

As to the Butler incident, neither Kelley nor Peabody was a direct participant, and, more significantly, there was no underlying violation of a constitutional right in any event. To determine whether Brown's broader allegations of a pattern of harassment state a plausible claim for supervisory liability, I "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Iqbal, 129 S. Ct. at 1950. Brown's claim is rife with conclusions but short on factual allegations, other than the Butler incident. According to the complaint, Peabody, like Kelley, failed to instruct, supervise, control, and discipline Rockport police officers in their duty to refrain from denying Brown his rights. Clearly that statement is nothing more than the kind of "defendant unlawfully harmed me" statement eschewed by the Supreme Court in Iqbal. Id. at 1949. Peabody and/or Kelley may have had the power to prevent or aid in preventing the wrongs allegedly done to Brown, as alleged in conclusory fashion, but that is, again, simply stating that they are responsible for harm to Brown. These conclusory allegations would not state a claim against the defendants with

---

[9]    The Supreme Court has firmly rejected respondeat superior as a theory of liability under Section 1983. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978).

supervisory authority, even if there were some factual allegations related to a real deprivation of rights by an unnamed patrol officer.

As for the underlying allegations, Brown alleges that Peabody and Kelley approved conduct of the Rockport police department that involved harassing Brown by following him or his wife whenever they drive about in Rockport. This harassment allegedly started in 2008 and continued into 2010, but "harassment" in this context is merely a conclusory label. Nothing in the factual allegations suggests an unconstitutional infringement of Brown's right to travel freely through Rockport. He does not allege being stopped nor does he allege any intrusion onto his premises or the seizure or destruction of personal property. The conclusory allegation of harassment-by-tailing is too slender a reed upon which to rely for a claim of supervisory liability.

Finally, Brown advances his Section 1983 claim against the Town of Rockport itself, based upon a failure to train theory. As the Town has correctly noted, the Supreme Court's opinion in City of Canton, Ohio v. Harris disposes of this claim. 489 U.S. 378, 390-92 (1989) (holding that a failure to train claim is only viable where the municipality's "failure to train reflects deliberate indifference" toward its officers' deprivation of constitutional rights). Since Brown's complaint, read in the light most favorable to him, does not establish a constitutional violation by any Rockport police officer or official, the necessary link between a municipal policy or custom and the constitutional deprivation is, of course, nonexistent. Even assuming some underlying deprivation, the mere conclusory allegation of inadequate training would not suffice for pleading purposes. The Town of Rockport and the other Rockport Defendants are entitled to dismissal, with prejudice, of the Section 1983 claim. The other defendants are also entitled to dismissal, with prejudice, of the Section 1983 claim because they are not state actors

and no Section 1983 conspiracy with state actors in either Rockport or Camden has been alleged on these factual averments.

**B.      The RICO Claim**

Brown alludes to a collection of federal crimes in his complaint.  As a private citizen, Brown does not have standing to prosecute these alleged crimes.  <u>Davit v. Davit</u>, 173 Fed. Appx. 515, 518 (7th Cir. 2006) (unpublished) (citing <u>Linda R.S. v. Richard D.</u>, 410 U.S. 614, 619 (1973)); <u>Gill v. Texas</u>, 153 Fed. Appx. 261, 262-63 (5th Cir. 2005) (unpublished) (same). However, the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961 *et seq.*, permits a private citizen to seek redress against racketeers whose criminal enterprise has imposed injury on that person.  Under RICO:  "Any person injured in his business or property by reason of a violation of section 1962 . . . may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains . . ."  <u>Id.</u> § 1964(c).  The defendants' motions are sufficient to achieve dismissal based on the argument that Brown fails to state a RICO claim as to them.  Brown's RICO claim, and the attendant conspiracy, is set forth in paragraphs 51-69 of the complaint.

To state a valid RICO claim, Brown must allege a violation of 18 U.S.C. § 1962.  The only conceivably relevant portion of section 1962 is that subsection which prohibits any person from "acquir[ing] or maintain[ing], directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce," when that interest or control is gained "through a pattern of racketeering activity or through collection of an unlawful debt."  <u>Id.</u> § 1962(c).  Such a RICO claim requires proof of four elements:  "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." <u>Sedima, S.P.R.L. v. Imrex Co.</u>, 473 U.S. 479, 496 (1985).  As for the fourth element,

racketeering activity consists of certain "acts indictable under any one or more of certain specified criminal laws" itemized at section 1961(1)(A)(B). Feinstein v. Resolution Trust Corp., 942 F.2d 34, 42 (1st Cir. 1991). A defendant is not subject to liability under RICO absent participation in two or more such acts. Id. at 41.

In his complaint, Brown alleges, in conclusory fashion, violations of 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1513 (relating to retaliation against a victim). The only seemingly relevant allegation is an allegation that the Laites[10] committed mail fraud from 1987 through 2002 in connection with the sale of lots in the subdivision where Brown resides and that Brown was a victim of that offense. (Compl. ¶¶ 173-177, 194.) Brown also suggests that in an entirely separate incident Ronson violated 18 U.S.C. § 1513 by engaging in some premeditated act of retaliation with Morse. (Id. ¶ 213.) There is no logical or otherwise plausible connection between Richards & Cranston and Ronson in terms of a RICO violation. Brown does not include any factual, non-conclusory allegations that would suggest a plausible basis for extending a RICO claim to the defendants whose motions are addressed herein.

This kind of property dispute over a boundary line simply does not merit RICO consideration. Brown is the only victim of the alleged activity and the various acts complained of all relate to or arise from a dispute over his boundary line and the erection and destruction of a fence. There is law suggesting that this kind of scenario simply is incongruous with the enterprise and pattern of racketeering concepts. One would think that this kind of dispute over real property would be amenable to an orderly legal resolution in the jurisdiction where the property is found. The fact that it has dragged on for years is not, in my view, indicative of a continuing criminal racket. See, e.g., Gamboa v. Velez, 457 F.3d 703, 708-710 (7th Cir. 2006)

---

[10] See, *supra*, note 5 and the companion recommended decision on motions to dismiss filed by the "Camden Defendants."

(reversing denial of motion to dismiss RICO claim that was based on an alleged murder "frame-up" (malicious prosecution) orchestrated by police officers and involving more than one alleged victim, but only one criminal investigation); Midwest Grinding Co. v. Spitz, 976 F.2d 1016, 1025 (7th Cir. 1992) (addressing a "closed-ended scheme [that] has none of the trappings of a long-term criminal operation that carries with it a threat to society"); Sever v. Alaska Pulp Corp., 978 F.2d 1529, 1535 (9th Cir. 1992) (affirming dismissal of RICO claim where allegations involved a number of acts, but only a "single episode having the singular purpose of impoverishing" the plaintiff, the only victim involved, and did not raise a concern of racketeering as a regular way of conducting business); Boone v. Carlsbad Bancorporation, Inc., 972 F.2d 1545, 1556 (10th Cir. 1992) ("Plaintiffs allege what is actually a closed-ended series of predicate acts constituting a single scheme . . . to accomplish a discrete goal . . . directed at a finite group of individuals . . . 'with no potential to extend to other persons or entities.' Thus plaintiffs have not alleged the type of activity that RICO was enacted to address.") (quoting Sil-Flo, Inc. v. 12 SFHC, Inc., 917 F.2d 1507, 1516 (10th Cir. 1990)); Thermodyn Corp. v. 3M Co., 593 F. Supp. 2d 972, 981 (N.D. Ohio 2008) ("Where a single objective is alleged, 'the purported racketeering activity does not bear the markings of the long-term criminal conduct about which Congress was concerned when it enacted RICO.'") (quoting Moon v. Harrison Piping Supply, 465 F.3d 719, 725-26 (6th Cir. 2006)); Meyer Material Co. v. Mooshol, 188 F. Supp. 2d 936, 941-43 (N.D. Ill. 2002) (holding that evidence of multiple illegal acts in furtherance of a single kickback scheme involving one victim does not constitute a pattern of predicate acts). Paraphrasing the Gamboa opinion, "it is not uncommon for [a boundary dispute] to develop over the course of several years" and the activities undertaken in the course of that dispute do not pose a threat of "similar

misconduct" or "continued criminal activity" outside of that focused dispute. <u>Gamboa</u>, 457 F.3d at 710.

## C.     The State Law Claims

Brown has failed to allege a plausible entitlement to relief against the defendants addressed herein (the Rockport Defendants and Ronson, Gale, and Richards & Cranston, Surveyors) on any cognizable federal claim set out in his unwieldy complaint.  The question remains whether his allegations are sufficient to state a claim for relief against these particular defendants under state law.  The motions to dismiss filed by these defendants do not really tackle this question, though collectively they do request a more definite statement from Brown, suggest that fraud has not been plead with sufficient specificity, and contend that diversity of citizenship would need to be demonstrated for the state claims to move forward in this venue.  (Gale Mot. to Dismiss at 5, Doc. No. 32;  Rockport Defs. Mot. to Dismiss at 6, Doc. No. 36;  Richards & Cranston Mot. to Dismiss at 8, Doc. No. 40;  Ronson Mot. to Dismiss at 2, Doc. No. 31.)

In his responses, Brown has indicated that his non-federal claims involve false arrest and stalking against the Rockport Defendants (Doc. No. 54 ¶¶ 3, 5), professional negligence against Defendant Gale (Doc. No. 50 ¶ III), professional misconduct against Defendant Ronson (Doc. No. 49 at 4, ¶ 9); and professional misconduct against Defendant Richards & Cranston (Doc. No. 61 at 3, ¶ 4).

Exercising supplemental jurisdiction over state law claims depends upon whether the claims are so related to the surviving federal claims that they form part of the same case or controversy under Article III of the United States Constitution.  28 U.S.C. 1367(a).  Normally this Court declines to exercise supplemental jurisdiction, even if the state claims arise from the same case or controversy, if the Court has dismissed all claims over which it has original

jurisdiction.  28 U.S.C. § 1367(c)(3);  Rodriguez v. Doral Mortgage Corp., 57 F.3d 1168, 1177

(1st Cir.1995) ("As a general principle, the unfavorable disposition of a plaintiff's federal claims

at the early stages of a suit . . . will trigger the dismissal without prejudice of any supplemental

state-law claims.").  Where federal claims remain, however, the Court should retain associated

state law claims when they arise from the same "nucleus of operative fact" as the federal claim.

See Cormier v. Funtown/Splashtown USA, Inc., 294 F. Supp.2d 125, 130  (D. Me. 2003)

(Cohen, Mag. J., Rec. Dec., adopted by Hornby, J.).  This can include state law claims against

defendants who are not subject to the federal claims under a "more radical form" of supplemental

jurisdiction known as "pendent party jurisdiction."  Erwin Chemerinsky, Federal Jurisdiction §

5.4 (5th ed. 2007) (discussing the scope of 28 U.S.C. § 1367).  The supplemental jurisdiction

statute offers a group of relevant factors for consideration.  18 U.S.C. § 1367(a), (c).  The

determination of such questions is subject to an abuse of discretion standard on appeal.  Rossi v.

Gemma, 489 F.3d 26, 39 (1st Cir. 2007).

There is no good reason for this Court to retain supplemental jurisdiction over false

arrest, stalking, and professional misconduct claims asserted against these defendants.  Indeed,

probably this Court lacks subject matter jurisdiction over those claims.  Assuming that there is

room in this case for the Court to exercise its discretion in favor of hearing such claims, the

Court should exercise that discretion by dismissing the claims without prejudice.

The state claims against Ronson, Gale, and Richards & Cranston Surveyors are simply

too dissimilar to be considered as arising from the same nucleus of operative facts as the rest of

the claims in the complaint.  Even if one takes it as true that these defendants made professional

misjudgments about their work and that their errors harmed Brown in relation to his property

interest, professional negligence is not the equivalent of a conspiracy to deprive another of his

constitutional rights. Moreover, these theories require a different order of proof than is required to prove a civil rights violation. Brown would need to rely on the testimony of surveyors and attorneys to establish professional negligence, and that kind of evidence is not required in relation to a civil rights claim.

As for the Rockport Defendants, what is alleged does not offer a plausible basis to infer that they committed a civil rights violation involving false arrest.[11] Preserving them as defendants in this action on a state law stalking or harassment theory would be improper as such a theory of liability has not been adequately pled on these facts. In his various pleadings regarding these motions, Brown has not argued that any other state law torts are applicable to the Rockport defendants and I conclude that he has waived any of the other state claims asserted in the complaint.

Finally, as to all of these professional defendants, it must be stated that the conspiracy allegations are wholly conclusory and that the degree of factual content does not support a plausible inference of a conspiratorial design. Consequently, they would only remain in this case in order to determine the adequacy of their professional services. That is not an efficient use of this Court's resources as a determination of such questions in Brown's favor would still not provide a non-speculative basis to infer participation in a conspiracy to deprive him of any civil right.

Brown's remedy against these defendants, if any is to be had, will have to be found in state court. These disparate claims against three separate private individuals, separate in time and involving separate events and potential liability, are not part of the same case or controversy

---

[11] It is doubtful if any state law claims survive against the Town of Rockport or the other Rockport defendants because there is absolutely no indication in the complaint that Brown has ever complied with the Maine Tort Claims Act, 14 M.R.S. § 8101, *et seq*. However, that issue was not joined by the motion to dismiss and I therefore have no reason to reach it.

that gives rise to federal question jurisdiction. Complaints of professional negligence and violation of protective covenants involve different facts than those that form the basis of the civil rights claim and/or the RICO claim. Contrary to Brown's complaint, the federal court is not the place to re-litigate the merits of the boundary dispute or determine the accuracy of land surveys or legal advice and those claims do not arise from the same nucleus of facts as the alleged civil rights violation. In all probability, this Court does not have supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367(a). Even if it does retain some fragment of supplemental jurisdiction over some claim involving one of these defendants, there are compelling reasons to dismiss these defendants from this lawsuit under section 1367(c)(4), given the exceptional circumstances created by this unwieldy and poorly conceived complaint and the utterly conclusory nature of the conspiracy allegations.

### Conclusion

Based upon the foregoing, I RECOMMEND that the Court GRANT these defendants' motions, as follows:

As to the motions of Defendant Ronson (Doc. No. 31), Defendant Gale (Doc. No. 32), and Defendant Richards & Cranston Surveyors (Doc. No. 40), DISMISS all federal claims with prejudice and DISMISS all supplemental state law claims without prejudice, under 28 U.S.C. § 1367(a), (c)(4);

As to the motion of Defendants Butler, Kelly, Peabody, and the Town of Rockport (Doc. No. 36), DISMISS WITH PREJUDICE all claims, both federal and state, for failure to state a claim.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to

21

28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

April 28 , 2011                    /s/ Margaret J. Kravchuk
                                   U.S. Magistrate Judge